**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JEN LIANG and MASON MALDONADO, individually and on behalf of all others similarly situated, | ) | **Case No.:** |
| Plaintiffs, | ) | |
| v. | ) | **CLASS ACTION COMPLAINT** |
| EVOLVE BANK AND TRUST, | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Jen Liang and Mason Maldonado, individually and on behalf of all others similarly situated, through the undersigned counsel, hereby allege the following against Defendant Evolve Bank and Trust ("Evolve"). Facts pertaining to Plaintiffs are alleged based upon personal knowledge and all other facts herein are alleged based upon information and belief, as well as, *inter alia*, the investigation of Plaintiffs' counsel.

## NATURE OF THE ACTION

1. Plaintiffs bring this class action against Defendant for its (i) failure to properly secure and safeguard highly valuable, protected personally identifiable information, including without limitation, full names, contact information, Social Security numbers, dates of birth, account information and other personal information (collectively "PII"); (ii) failure to comply with industry standards to protect information systems that contain PII; (iii) unlawful disclosure of the PII of Plaintiffs and other members of the class; and (iv) failure to provide adequate notice to Plaintiffs and other members of the class that their PII had been disclosed and compromised.

2. Evolve discovered the data breach in late May of 2024.[1]

3. Despite learning of the Data Breach in or around May of 2024, Evolve did not begin notifying impacted individuals until late June of 2024. This delay deprived Plaintiffs and class members of the opportunity to take meaningful steps to mitigate the impact of the Data Breach.

4. Plaintiffs Jen Liang and Mason Maldonado are among the thousands of individuals who shared their most valuable data with Evolve or with business contracting with it based on the ordinary and reasonable understanding that their sensitive PII would be handled and maintained with appropriate safety standards.

5. Despite representations that Evolve provided secure banking services, in reality its decision-making regarding its data security and its monitoring of its data security were all woefully inadequate. Evolve and its agents' unsound, vulnerable systems containing valuable data, including Plaintiffs' and class members' PII, were an open invitation for intrusion and exfiltration by cybercriminals, who were seeking to exploit this valuable information.

6. The value of the Evolve customers' stolen data, including PII, is recognized by many different constituencies. First, the value is recognized by the Defendant themselves. Second, the value is recognized by cybercriminals who exploit this data to commit identity theft and fraud. And third, the value is recognized by the individuals, themselves, including Plaintiffs and class members, whose PII was stolen.

7. As a result, Plaintiffs and class members are at substantially increased risk of future identity theft, both currently and for the indefinite future. Plaintiffs' and class members' PII—

[1] https://www.getevolved.com/about/news/cybersecurity-incident/substitute-notice-of-data-breach/ (last accessed August 27, 2024).

including their social security number and financial account numbers which were compromised by cyber criminals in the Data Breach—is highly valuable to bad actors who may seek to commit fraud and identity theft.

8. Given that information relating to the Data Breach, including the systems that were impacted and the configuration and design of Limestone Bank's website and all Defendant's systems, remain exclusively in Defendant's control, Plaintiffs anticipate that additional information in support for their claims will emerge during discovery.

## PARTIES

### A. Plaintiff Jen Liang

9. Plaintiff Jen Liang was a resident of Portsmouth, New Hampshire from the time the data breach occurred until August of 2024, at which point she moved to Boston, Massachusetts. Plaintiff Liang provided Defendant with her PII as a condition of receiving banking and financial services via her Yieldstreet investment account and on the condition that it be maintained as confidential and with the understanding that Defendant would employ reasonable safeguards to protect her Private Information. If Plaintiff Liang had known that Defendant would not adequately protect her Private Information, she would not have entrusted Defendant with her Private Information or allowed Defendant to maintain this sensitive Private Information.

10. Plaintiff Liang has been a customer of Evolve Bank since June of 2022.

11. Plaintiff Liang is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

12. As a result of the Data Breach, Plaintiff Liang made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach as well as checking her financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff has spent significant time remedying the breach – valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. Plaintiff Liang estimates that she has spent dozens of hours as a result of the data breach.

13. Plaintiff suffered actual injury from having her Personal Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) lost time spent on activities remedying harms resulting from the Data Breach; (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) diminution of value of her Private Information; and (vi) the continued and increased risk of fraud and identity theft.

14. On or around June 11, 2024, a fraudulent charge of $676 posted to Plaintiff Liang's JP Morgan Chase credit card account.

15. Plaintiff Liang suffered additional injury in the form of funds valued at approximately $500,000 being frozen in her Yieldstreet account.

16. Plaintiff Liang has suffered an extreme increase in spam and fraudulent messaging since the data breach.

17. The Data Breach has caused Plaintiff Liang to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

18. As a result of the Data Breach, Plaintiff Liang anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Liang is at present risk and will continue to be at increased risk of identity theft and fraud for years to come.

19. Plaintiff Liang has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**B. Plaintiff Mason Maldonado**

20. Plaintiff Mason Maldonado is a citizen and resident of Brookfield, Illinois. Plaintiff Maldonado provided Defendant with his PII as a condition of receiving banking and financial services on the condition that it be maintained as confidential and with the understanding that Defendant would employ reasonable safeguards to protect his Private Information. If Plaintiff Maldonado had known that Defendant would not adequately protect his Private Information, he would not have entrusted Defendant with his Private Information or allowed Defendant to maintain this sensitive Private Information.

21. Plaintiff Maldonado has been a customer of Evolve Bank since approximately January of 2020.

22. Plaintiff Maldonado is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

23. As a result of the Data Breach, Plaintiff Maldonado made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach as well as checking his financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff has spent significant time remedying the breach – valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. Plaintiff Maldonado estimates that he has spent over a dozen hours as a result of the data breach.

24. Plaintiff suffered actual injury from having his Personal Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) lost time spent on activities remedying harms resulting from the Data Breach; (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) diminution of value of her Private Information; and (vi) the continued and increased risk of fraud and identity theft.

25. Plaintiff Maldonado has suffered an extreme increase in spam and fraudulent messaging since the data breach.

26. The Data Breach has caused Plaintiff Maldonado to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

27. As a result of the Data Breach, Plaintiff Maldonado anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Maldonado is at present risk and will continue to be at increased risk of identity theft and fraud for years to come.

28. Plaintiff Maldonado has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**C. Defendant Evolve Bank and Trust**

29. Defendant Evolve is bank headquartered in Memphis, Tennessee. Evolve is a "national best-in-class financial services institution that combines the expertise of a bank and the power of technology to offer our clients unique profitable solutions."[2]

## JURISDICTION AND VENUE

30. The Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2) ("CAFA"), because (a) there are 100 or more class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

31. The Court has personal jurisdiction over Defendant Evolve's principal place of business is located here, and Defendant conduct substantial business in this District.

32. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant maintain places of business in this District and therefore reside in this District pursuant to 28 U.S.C. § 1391(c)(2). A substantial part of the events or omissions giving rise to the Class's claims also occurred in this District.

[2] https://www.getevolved.com/about/about-us/about-evolve/ (last accessed August 27, 2024.)

## FACTS

**The Data Breach**

33. Evolve is a national bank. As part of its business, Defendant is entrusted with, and obligated to safeguard and protect the Private Information of Plaintiffs and the Class in accordance with all applicable law.

34. Evolve experienced the Data Breach in or around May of 2024. Defendant sent a generic, templated notification letter to Class Members, mailed on or around July 8, 2024, to Plaintiffs and Class members ("Notice"),

35. Information pertaining to Plaintiffs' and Class members' financial records was part of the data acquired by an unauthorized external party in the Data Breach.

36. Defendant advised in the Notice that Class members should monitor their credit to help them detect possible misuse of PII. As a result of the Data Breach, Plaintiffs and Class members have been and must continue to be vigilant and review their credit reports for incidents of identity theft, and educate themselves about security freezes, fraud alerts, and other steps to protect themselves against identity theft.

**A. Industry Standards for Data Security**

37. Because of the value of PII to hackers and identity thieves, companies in the business of obtaining, storing, maintaining, and securing PII, such as Defendants, have been identified as being particularly vulnerable to cyber-attacks. Cybersecurity firms have promulgated a series of best practices that at minimum should be implemented by sector participants including, but not limited to: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network

systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points. Organizations, companies, and banks—like Defendants—have an added incentive to harden their networks against unauthorized penetration, because they directly control the data necessary to access consumers' financial accounts.

38. Defendant is aware of the importance of safeguarding Plaintiffs' and Class member's PII, that by virtue of their business they place Plaintiffs' and Class member's PII at risk of being targeted by hackers.

39. Defendant is aware that the PII that they collect, organize, and store, can be used by criminals to engage in crimes such as identity fraud and theft using Plaintiffs' and Class members' PII.

40. Because of Defendant's failure to implement, maintain, and comply with necessary cybersecurity requirements, Defendant was unable to protect Plaintiffs' and Class members' information and confidentiality, and protect against obvious and readily foreseeable threats to information security and confidentiality. As a proximate result of such failures, criminals gained unauthorized access to Defendant's network unimpeded and acquired Plaintiffs' and Class members' personal and financial information in the Data Breach without being stopped.

41. Only after the attack was completed did Defendant begin to undertake basic steps recognized in the industry to protect Plaintiffs and Class members' PII.

42. Defendant was unable to prevent the Data Breach and was unable to detect the unauthorized access to vast quantities of sensitive and protected files containing protected information of Plaintiffs and Class members. Discovery on Defendants, law enforcement

investigators, and private investigators will reveal more specific facts about Defendant's deficient and unreasonable security procedures.

43. Security standards commonly accepted among businesses that store personal and financial information using the Internet include, without limitation:

- Maintaining a secure firewall configuration;
- Monitoring for suspicious or irregular traffic to servers;
- Monitoring for suspicious credentials used to access servers;
- Monitoring for suspicious or unknown users;
- Monitoring for suspicious or irregular server requests;
- Monitoring for server requests for personal and financial information;
- Monitoring for server requests from VPNs; and
- Monitoring for server requests from Tor exit nodes.

44. Defendant is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

45. The U.S. Federal Trade Commission ("FTC") publishes guides for businesses for cybersecurity[3] and protection of personal and financial information which includes basic security standards applicable to all types of businesses.[4]

46. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[5]

47. The FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and (most pertinent here) verify that third-party service providers have implemented reasonable security measures.

48. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

49. In 2021, the FTC updated its consumer information Safeguards Rule, requiring non-banking financial institutions such as mortgage brokers, motor vehicle dealers, and payday lenders, to develop, implement, and maintain comprehensive security systems to keep consumer

[3] *See* F.T.C., *Start with Security: A Guide for Business,* (June 2015), https://www.ftc.gov/system/files/documents/plaint-language/pdf0205-startwithsecurity.pdf.

[4] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/tipsadvice/business-center/guidance/protecting-personal-information-guide-business [https://perma.cc/9945-U4HV].

[5] *Id.*

information safe. Against the backdrop of a rapid increase in cybersecurity incidents related to consumer financial information, Samuel Levine, the director of the FTC's Bureau of Consumer Protection, issued a warning stating that, "Financial institutions and other entities that collect sensitive consumer data have a responsibility to protect it."[6]

50. Defendant also have obligations created by other federal and state laws and regulations, contracts, industry standards, and common law to maintain reasonable and appropriate physical, administrative, and technical measures to keep Plaintiffs' and class members' PII confidential and to protect it from unauthorized access and disclosure.

51. Given the magnitude of the risk and repercussions of a data breach or attack targeting this type of data, the likelihood of a data breach or attack, and Defendant's explicit awareness of these vulnerabilities, Defendant should have taken every reasonable precaution in developing a robust security program and protecting Plaintiffs' and the class members' PII.

52. Yet, despite their duties, representations, and promises, Defendant failed to adequately secure and protect their customers' data, allowing the Plaintiffs' and class members' PII to be accessed, disclosed, and misused.

53. Defendant also owed a duty to comply with industry standards in safeguarding PII, which—as discussed herein—they did not do.

54. Cyberattacks have become so notorious that the FBI and Secret Service issued an unprecedented warning in 2019 to potential targets so they were aware of, and prepared for, a potential attack.

[6] *FTC Strengthens Security Safeguards for Consumer Financial Information Following Widespread Data Breaches*, https://www.ftc.gov/news-events/news/press-releases/2021/10/ftc-strengthens-security-safeguards-consumer-financial-information-following-widespread-data

55. The U.S. government, various U.S. and international law enforcement agencies, cybersecurity industry groups and laboratories, and numerous industry trade groups have issued warnings and guidance on managing and mitigating phishing and ransomware threats. There are industry best practices for cybersecurity related to phishing and ransomware, some of which are particularly effective.

56. For example, in 2019, both Microsoft and Google publicly reported that using multi-factor authentication ("MFA") blocks more than 99% of automated hacks, including most ransomware attacks that occur because of unauthorized account access. Likewise, the reputable SANS Software Security Institute issued a paper stating "[t]ime to implement multi-factor authentication!"15 An example of MFA implementation is receiving a text with a code when you input your username and password into a website; even if a cybercriminal knew your username and password, the cybercriminal would not be able to see the code on your phone and would thus be blocked from accessing your online account.

57. In this regard, implementing MFA "can block over 99.9 percent of account compromise attacks."[7]

58. Yet, instead of following these widely adopted industry standards, Defendant failed to adequately secure and protect their customers' data, allowing the Plaintiffs' and class members' PII to be accessed, disclosed, and misused.

**C. The Value of the Compromised PII and Effects of Unauthorized Disclosure**

[7] What Is Multi-Factor Authentication (MFA)?, Consensus Techs. (Sept. 16, 2020), https://www.concensus.com/what-is-multi-factor-authentication/#:~:text=The%20proof%20 that%20MFA%20works,percent%20of%20account%20compromise%20attacks [https://perma.cc/RKT2-LX5Z].

59. Defendant understands the protected PII they acquire, store, and utilize is highly sensitive and of significant value to the owners of the PII and those who would use it for wrongful purposes.

60. PII is property with inherent and sizeable market value. Its value is axiomatic, considering the market value and profitability of "Big Data" corporations in America. Alphabet Inc., the parent company of Google, aptly illustrated this in its 2020 Annual Report, when it reported a total annual revenue of $182.5 billion and net income of $40.2 billion.[8] $160.7 billion of this revenue was derived from its Google business, which is driven almost exclusively by leveraging the PII it collects about the users of its various free products and services. America's largest corporations profit almost exclusively through the use of PII illustrating the considerable market value of PII.

61. Criminal law also recognizes the value of PII and the serious nature of the theft of such an asset by imposing prison sentences. This strong deterrence is necessary because cybercriminals earn significant revenue through stealing PII. Once a cybercriminal has unlawfully acquired personal data, the criminal can demand a ransom or blackmail payment for its destruction, use the information to commit fraud or identity theft, or sell the PII to another cybercriminal on a thriving black market.

62. Furthermore, PII is a valuable commodity to identity thieves, particularly when such data is aggregated in large numbers. Former United States Attorney General William P. Barr made clear that consumers' sensitive personal information commonly stolen in data breaches "has

[8] Alphabet Inc., Annual Report (Form 10-K) at 32 (Feb. 3, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001652044/000165204421000010/goog-20201231.htm.

economic value." The purpose of stealing large caches of personal data is to use it to defraud individuals or to place it for illegal sale and to profit from other criminals who buy the data and use it to commit fraud and identity theft. Indeed, cybercriminals routinely post stolen personal information for sale on anonymous websites, making the information widely available to a criminal underworld.

63. There is an active and robust market for this information. As John Sancenito, president of Information Network Associates, a company which helps companies with recovery after data breaches, explained after a data breach "[m]ost of the time what [data breach hackers] do is they steal the data and then they sell the data on the dark web to the people who actually commit the fraud."

64. Thus, Plaintiffs and class members rightfully place a high value not only on their PII, but also on the privacy of that data.

65. Once stolen, PII can be used in a number of different ways. One of the most common is that it is offered for sale on the "dark web," a heavily encrypted part of the Internet that makes it difficult for authorities to detect the location or owners of a website. The dark web is not indexed by normal search engines such as Google and is only accessible using a Tor browser (or similar tool), which aims to conceal users' identities and online activity. The dark web is notorious for hosting marketplaces selling illegal items such as weapons, drugs, and PII. Websites appear and disappear quickly, making it a dynamic environment.

The forms of PII involved in this Data Breach are particularly concerning. Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security numbers cannot be easily

replaced. Even when social security numbers and financial accounts are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies to update the person's accounts with those entities.

66. Indeed, even the Social Security Administration ("SSA") warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.

67. Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

**D. Data Breaches Put Consumers at Increased Risk of Fraud and Identify Theft**

68. Cyberattacks and data breaches of financial services companies are especially problematic because of the potentially permanent disruption they cause to the daily lives of their customers. Stories of identity theft and fraud abound, with hundreds of millions of dollars lost by everyday consumers every year as a result of internet-based identity theft attacks.[9]

69. The U.S. Government Accountability Office ("GAO") released a report in 2007 regarding data breaches finding that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[10]

70. The FTC recommends that identity theft victims take several steps to protect their personal health and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and to consider an extended fraud alert that lasts for seven years if identity theft occurs), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[11]

71. Cybercriminals use stolen PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

72. The PII exfiltrated in the Data Breach can also be used to commit identity theft by placing Plaintiffs and class members at a higher risk of "phishing," "vishing," "smishing," and "pharming," which are other ways for cybercriminals to exploit information they already have in

[9] Albert Khoury, Scam alert: 5 most costly data breaches (plus 5 states most targeted) (July 27, 2022), https://www.komando.com/security-privacy/most-costly-data-breaches/847800/

[10] Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown ("GAO Report") at 2, GAO (June 2007), https://www.gao.gov/assets/270/262899.pdf [https://perma.cc/GCA5-WYA5].

[11] Identity Theft Recovery Steps, FTC, https://www.identitytheft.gov/Steps (last visited Mar. 23, 2021) [https://perma.cc/ME45-5N3A]

order to get even more personally identifying information from a person through unsolicited email, text messages, and telephone calls purportedly from a legitimate company requesting personal, financial, and/or login credentials.

73. PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the cyber black market for years.

74. It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when PII and/or financial information is stolen and when it is used. According to the GAO, which conducted a study regarding data breaches, stolen data may be held for up to a year or more before being used to commit identity theft.

75. PII is such an inherently valuable commodity to identity thieves that, once compromised, criminals often trade the information on the cyber black-market for years.

76. Furthermore, data breaches that expose any personal data, and in particular non-public data of any kind (e.g., donation history or hospital records), directly and materially increase the chance that a potential victim is targeted by a spear phishing attack in the future, and spear phishing results in a high rate of identity theft, fraud, and extortion.

77. There is a strong probability that entire batches of stolen information from the Data Breach have yet to be made available on the black market, meaning Plaintiffs and class members are at an increased risk of fraud and identity theft for many years into the future. Indeed, some of the Plaintiffs and many class members are in very early stages of their lives—in their twenties and thirties. Thus, as the respective Notices advise, Plaintiffs must vigilantly monitor their financial accounts for many years to come.

78. As highly sophisticated parties that handle sensitive PII, Defendant failed to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of Plaintiffs' and other class members' PII to protect against anticipated threats of intrusion of such information.

79. The ramifications of Defendant's failure to keep Plaintiffs' and class members' PII secure are long lasting and severe. To avoid detection, identity thieves often hold stolen data for months or years before using it. Also, the sale of stolen information on the "dark web" may take months or more to reach end-users, in part because the data is often sold in small batches as opposed to in bulk to a single buyer. Thus, Plaintiffs and class members must vigilantly monitor their financial accounts ad infinitum.

80. Thus, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its systems were breached. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

81. Thus, Plaintiffs and class members are at an increased risk of fraud and identity theft for many years into the future.

**E. Damages to Plaintiffs and the Class**

82. Plaintiffs and the Class have been damaged by the compromise of their Private Information in the Data Breach.

83. As a result of Defendant's deficient security and monitoring measures, Plaintiffs and class members have been harmed by the compromise of their sensitive personal information,

which is currently for sale on the dark web and through private sale to other cyber criminals and/or being used by criminals for identify theft and other fraud-related crimes.

84. Plaintiffs and class members face a substantial and imminent risk of fraud and identity theft as their names have now been linked with their bank account numbers, emails, phone numbers, and physical addresses as a result of the Data Breach. These specific types of information are associated with a high risk of fraud.

85. Plaintiffs and class members also suffered a "loss of value" of their sensitive personal information when it was stolen by hackers in the Data Breach. A robust market exists for stolen personal information. Hackers sell personal information on the dark web—an underground market for illicit activity, including the purchase of hacked personal information— at specific identifiable prices. This market serves to determine the loss of value to Plaintiffs and class members.

86. As discussed above, Plaintiffs' and class members' stolen personal information is a valuable commodity to identity thieves.

87. Identity thieves can also combine data stolen in the Data Breach with other information about Plaintiffs and class members gathered from underground sources, public sources, or even Plaintiffs' and class members' social media accounts. Thieves can use the combined data to send highly targeted phishing emails to Plaintiffs and class members to obtain more sensitive information. Thieves can use the combined data to commit potential crimes, including opening new financial accounts in Plaintiffs' and class members' names, taking out loans in Plaintiffs' and class members' names, using Plaintiffs' and class members' information to obtain government benefits, filing fraudulent tax returns using Plaintiffs' and class members'

information, obtaining Social Security numbers in Plaintiffs' and class members' names but with another person's photograph, and giving false information to police during an arrest.

88. Plaintiffs and class members also suffered "benefit of the bargain" damages. Plaintiffs and class members overpaid for services that should have been—but were not—accompanied by adequate data security. Part of the interest and fees paid by Plaintiffs and class members to Evolve was intended to be used to fund adequate data security. Plaintiffs and class members did not get what they paid for.

89. Plaintiffs and class members have spent and will continue to spend substantial amounts of time monitoring their accounts for identity theft and fraud, the opening of fraudulent accounts, disputing fraudulent transactions, and reviewing their financial affairs more closely than they otherwise would have done but for the Data Breach.

90. Plaintiffs and class members may also incur out of pocket costs for protective measures such as identity theft protection, credit monitoring fees, credit report fees, credit freeze fees, fees for replacement cards, and similar costs related to the Data Breach.

91. Class members who experience actual identity theft and fraud will also be harmed by the inability to use their credit or debit cards when their accounts are suspended or otherwise rendered unusable due to fraudulent charges. To the extent class members are charged monthly/annual fees for their credit and/or debit accounts, they are left without the benefit of that bargain while they await receipt of their replacement cards. Class members will be harmed further by the loss of rewards points or airline mileage that they cannot accrue while awaiting replacement cards. The inability to use payment cards may also result in missed payments on bills and loans,

late charges and fees, and adverse effects on their credit, including decreased credit scores and adverse credit notations.

92. In the case of a data breach, merely reimbursing a consumer for a financial loss due to identity theft or fraud does not make that individual whole again. On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."

93. A victim whose personal information has been stolen or compromised may not see the full extent of identity theft or fraud until long after the initial breach. Additionally, a victim whose personal information has been stolen may not become aware of charges when they are nominal, as typical fraud-prevention algorithms may not capture such charges. Those charges may be repeated, over and over again, on a victim's account.

The risk of identity theft and fraud will persist for years. Identity thieves often hold stolen data for months or years before using it to avoid detection. Also, the sale of stolen information on the dark web may take months or more to reach end-users, in part because the data is often sold in small batches to various individuals rather than in bulk to a single buyer. Thus, Plaintiffs and class members must vigilantly monitor their financial accounts ad infinitum.

## CLASS ACTION ALLEGATIONS

94. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

95. Plaintiffs bring this action individually and on behalf of all other persons similarly situated (the "Class") pursuant to Federal Rule of Civil Procedure 23.

96. Plaintiffs propose the following Class definition subject to amendment based on information obtained through discovery. Notwithstanding, at this time, Plaintiffs brings this action and seeks certification of the following Nationwide Class and Subclass (collectively defined herein as the "Class"):

**<u>Nationwide Class</u>**

> All persons nationwide whose Private Information was compromised as a result of the Data Breach impacting Defendant's computer systems that occurred on or around May of 2024.

**<u>New Hampshire Subclass</u>**

> All citizens of New Hampshire whose Private Information was compromised as a result of the Data Breach impacting Defendant's computer systems that occurred on or around May of 2024

97. Excluded from the Nationwide Class and Subclass are Defendant and Defendant's affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

98. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

99. **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of the Class and are so numerous that joinder of all Class members would be impracticable. On information and belief, the Nationwide Class numbers in the thousands.

- **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members of the Class.

Such common questions of law or fact include, *inter alia*: Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

- Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

- Whether Defendant properly implemented its purported security measures to protect Plaintiffs' and the Class's Private Information from unauthorized capture, dissemination, and misuse;

- Whether Defendant took reasonable measures to determine the extent of the Data Breach after it first learned of same;

- Whether Defendant disclosed Plaintiffs' and the Class's Private Information in violation of the understanding that the Private Information was being disclosed in confidence and should be maintained;

- Whether Defendant willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiffs' and the Class's Private Information;

- Whether Defendant were negligent in failing to properly secure and protect Plaintiffs' and the Class's Private Information;

- Whether Defendant were unjustly enriched by its actions; and

- Whether Plaintiffs and the other members of the Class are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

100. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs and other members of the Class. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by

comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

101. **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, all Class members were similarly injured through Defendant's uniform misconduct described above and were thus all subject to the Data Breach alleged herein. Further, there are no defenses available to Defendant that are unique to Plaintiff.

102. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate representatives of the Nationwide Class because their interests do not conflict with the interests of the Classes they seek to represent, they have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

103. **Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23 (b)(2).

104. **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to

individually seek redress for Defendant's wrongful conduct. Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiffs and the Nationwide Class)**

105. Plaintiffs fully incorporate by reference all of the above paragraphs, as though fully set forth herein.

106. Upon Defendant's accepting and storing the Private Information of Plaintiffs and the Class in its computer systems and on its networks, Defendant undertook and owed a duty to Plaintiffs and the Class to exercise reasonable care to secure and safeguard that Information and to use commercially reasonable methods to do so. Defendant knew that the Private Information was private and confidential and should be protected as such.

107. Defendant owed a duty of care not to subject Plaintiffs' and the Class's Private Information to an unreasonable risk of exposure and theft because Plaintiffs and the Class were foreseeable and probable victims of any inadequate data security practices.

108. Defendant owed numerous duties to Plaintiffs and the Class, including the following:

- to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in their possession;

- to protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

- to implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

109. Defendant also breached its duty to Plaintiffs and Class members to adequately protect and safeguard Private Information by disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured Private Information. Furthering their dilatory practices, Defendant failed to provide adequate supervision and oversight of the Private Information with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted a malicious third party to gather Plaintiffs' and Class members' Private Information and potentially misuse the Private Information and intentionally disclose it to others without consent.

110. Defendant knew, or should have known, of the risks inherent in collecting and storing Private Information and the importance of adequate security. Defendant knew or should have known about numerous well-publicized data breaches.

111. Defendant knew, or should have known, that its data systems and networks did not adequately safeguard Plaintiffs' and Class members' Private Information.

112. Defendant breached its duties to Plaintiffs and Class members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs and Class members' Private Information.

113. Because Defendant knew that a breach of its systems would damage thousands, including Plaintiffs and Class members, Defendant had a duty to adequately protect its data systems and the Private Information contained thereon.

114. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Class members, which is recognized by laws and regulations including but not limited to common law. Defendant were in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class members from a data breach.

115. As further evidence of its negligence, Defendant also failed in its duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

116. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

117. Defendant's own conduct also created a foreseeable risk of harm to Plaintiffs and Class members and their Private Information. Defendant's misconduct included failing to: (1) secure Plaintiffs' and Class member's Private Information; (2) comply with industry standard security practices; (3) implement adequate system and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

118. Defendant breached their duties, and thus were negligent, by failing to use reasonable measures to protect Class members' Private Information, and by failing to provide timely notice of the Data Breach. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

- Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' Private Information;
- Failing to adequately monitor the security of Defendant's networks and systems;
- Allowing unauthorized access to Class members' Private Information;
- Failing to detect in a timely manner that Class members' Private Information had been compromised; and
- Failing to timely notify Class members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

119. Through Defendant's acts and omissions described in this Complaint, including its failure to provide adequate security and failure to protect Plaintiffs' and Class members' Private Information from being foreseeably captured, accessed, disseminated, stolen and misused, Defendant unlawfully breached their duty to use reasonable care to adequately protect and secure Plaintiffs' and Class members' Private Information during the time it was within Defendant's possession or control.

120. Defendant's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to failing to adequately protect the Private Information and failing to provide Plaintiffs and Class members with timely notice that their sensitive Private Information had been compromised.

121. Neither Plaintiffs nor other Class members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

122. As a direct and proximate cause of Defendant's conduct, Plaintiffs and Class members suffered damages as alleged above.

123. Plaintiffs and Class members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide lifetime free credit monitoring to all Class members.

**COUNT II**
**Breach of Contract**
**(On Behalf of Plaintiffs and the Nationwide Class)**

124. Plaintiffs fully incorporate by reference all of the above paragraphs, as though fully set forth herein.

125. Plaintiffs and other Class members entered into valid and enforceable express contracts with Defendant under which Plaintiffs and other Class members agreed to provide their Private Information to Defendants, and Defendant impliedly, if not explicitly, agreed to protect Plaintiffs and Class members' Private Information.

126. To the extent Defendant's obligation to protect Plaintiffs' and other Class members' Private Information was not explicit in those express contracts, the express contracts included implied terms requiring Defendant to implement data security adequate to safeguard and protect the confidentiality of Plaintiffs' and other Class members' Private Information, including in accordance with trade regulations; federal, state and local laws; and industry standards. Plaintiffs and Class members would not have entered into these contracts with Defendant without the

understanding that their Private Information would be safeguarded and protected; stated otherwise, data security was an essential implied term of the parties' express contracts.

127. A meeting of the minds occurred, as Plaintiffs and Class members agreed, among other things, to provide their Private Information in exchange for Defendant's agreement to protect the confidentiality of that Private Information.

128. The protection of Plaintiffs and Class members' Private Information were material aspects of Plaintiffs and Class Members' contracts with Defendants.

129. Defendant's promises and representations described above relating to industry practices, and about Defendant's purported concern about their employees' privacy rights became terms of the contracts between Defendant and its employees, including Plaintiffs and other Class Members. Defendant breached these promises by failing to comply with reasonable industry practices.

130. Plaintiffs and Class members fully performed their obligations under the implied contract with Defendants; however, Defendant did not.

131. As a result of Defendant's breach of these terms, Plaintiffs and other Class members have suffered a variety of damages including but not limited to: the lost value of their privacy; they did not get the benefit of their bargain with Defendants; they lost the difference in the value of the secure services Defendant promised and the insecure services received; the value of lost time and effort required to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*¸ that required to place "freezes" and "alerts" with credit reporting agencies, to contact financial institutions, to close or modify financial accounts, to closely review and monitor credit reports and various accounts for unauthorized activity, and to file police reports;

and Plaintiffs and other Class members have been put at increased risk of future identity theft, fraud, and/or misuse of their Private Information, which may take years to manifest, discover, and detect.

132. Plaintiffs and Class members are therefore entitled to damages, including restitution and unjust enrichment, disgorgement, declaratory and injunctive relief, and attorney fees and costs.

**COUNT III**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Nationwide Class)**

133. Plaintiffs fully incorporate by reference all of the above paragraphs, as though fully set forth herein.

134. Plaintiffs brings this claim for breach of implied contract alternatively to Count II.

135. Through their course of conduct, Defendants, Plaintiff, and Class members entered into implied contracts for the employment, as well as implied contracts for the Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiffs' and Class members' Private Information.

136. Specifically, Plaintiffs entered into a valid and enforceable implied contract with Defendant when she entered into an account with Defendants.

137. The valid and enforceable implied contracts to provide labor services that Plaintiffs and Class members entered into with Defendant include Defendant's promise to protect nonpublic Private Information given to Defendant or that Defendant creates on its own from disclosure.

138. When Plaintiffs and Class members provided their Private Information to Defendant as part of Defendant's regular employment practices, they entered into implied

contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

139. Defendant solicited and invited Class members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class members accepted Defendant's offers and provided their Private Information to Defendant.

140. In entering into such implied contracts, Plaintiffs and Class members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, and were consistent with industry standards.

141. Class members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. Defendant failed to do so.

142. Under implied contracts, Defendant and/or its affiliated providers promised and were obligated to: (a) provide labor services to Plaintiffs and Class members; and (b) protect Plaintiffs' and the Class members' Private Information provided to obtain such benefits of such services. In exchange, Plaintiffs and Members of the Class agreed to pay money for these services, and to turn over their Private Information.

143. Data security of Plaintiffs' and Class members' Private Information was a material aspect of these implied contracts.

144. The implied contracts for the provision of labor services—contracts that include the contractual obligations to maintain the privacy of Plaintiffs' and Class members' Private Information—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's Data Breach notification letter.

145. Employees value their privacy, the privacy of their dependents, and the ability to keep their Private Information associated with obtaining such services. Plaintiffs and Class members would not have entrusted their Private Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Information would be safeguarded and protected or entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

146. Defendant's express representations, including, but not limited to the express representations found in its Privacy Notice, memorialize and embody the implied contractual obligation requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiffs' and protect the privacy of Plaintiffs' and Class members Private Information.

147. A meeting of the minds occurred, as Plaintiffs and Class members agreed and provided their Private Information to Defendant and/or its affiliated companies with an understanding that their private information would be protected.

148. Plaintiffs and Class members performed their obligations under the contract when they agreed to employment and provided their Private Information.

149. Defendant materially breached its contractual obligation to protect the nonpublic Private Information Defendant gathered when the information was accessed and exfiltrated by the Data Breach.

150. Defendant materially breached the terms of the implied contracts, including, but not limited to, the terms stated in the relevant Notice of Privacy Practices. Defendant did not maintain the privacy of Plaintiffs' and Class members' Private Information as evidenced by its

notifications of the Data Breach to Plaintiffs and Class members. Specifically, Defendant did not comply with industry standards, standards of conduct embodied in statutes like Section 5 of the FTCA, or otherwise protect Plaintiffs' and Class members' private information as set forth above.

151. The Data Breach was a reasonably foreseeable consequence of Defendant's action in breach of these contracts.

152. As a result of Defendant's failure to fulfill the data security protections promised in these contracts, Plaintiffs and Class members did not receive full benefit of the bargain, and instead labor services that were of a diminished value to that described in the contracts. Plaintiffs and Class members therefore were damaged in an amount at least equal to the difference in the value of the labor services with data security protection and the services they received.

153. Had Defendant disclosed that there security was inadequate or that it did not adhere to industry-standard security measures, neither the Plaintiff, Class members, nor any reasonable person would have utilized services from Defendant and/or its affiliated entities by entering into these implied contracts.

154. As a direct and proximate result of the Data Breach, Plaintiffs and Class members have been harmed and suffered, and will continue to suffer, actual damages and injuries, including without limitation the release and disclosure of their Private Information, the loss of control of their Private Information, the imminent risk of suffering additional damages in the future, out of pocket expenses, and the loss of the benefit of the bargain they had struck with Defendants.

155. Plaintiffs and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

156. Plaintiffs and Class members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class members.

**COUNT IV**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Nationwide Class)**

157. Plaintiffs fully incorporate by reference all of the above paragraphs, as though fully set forth herein.

158. In providing their Private Information to Defendants, Plaintiffs and Class members justifiably placed a special confidence in Defendant to act in good faith and with due regard to interests of Plaintiffs and Class members to safeguard and keep confidential that Private Information.

159. Defendant accepted the special confidence Plaintiffs and Class members placed in it, as evidenced by its acceptance of Plaintiffs and Class members PII, including social security numbers.

160. In light of the special relationship between Defendant and Plaintiffs and Class members, whereby Defendant became a guardian of Plaintiffs' and Class members Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of the individuals it provides labor services to, including Plaintiffs and Class members for the safeguarding of Plaintiffs and Class member's Private Information.

161. Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class members upon matters within the scope of its employees' relationship, in particular, to keep secure the Private Information of the individuals on its computer systems.

162. Defendant breached its fiduciary duties to Plaintiffs and Class members by failing to protect the integrity of the systems containing Plaintiffs' and Class member's Private Information.

163. Defendant breached its fiduciary duties to Plaintiffs and Class members by otherwise failing to safeguard Plaintiffs' and Class members' Private Information.

164. As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiffs and Class members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Cyber-Attack and Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Cyber-Attack and Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (vii) the diminished value of Defendant's services they received.

165. As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiffs and Class members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**COUNT V**
**Unjust Enrichment/Quasi Contract**
**(On Behalf of the Nationwide Class)**

166. Plaintiffs fully incorporate by reference all of the above paragraphs, as though fully set forth herein.

167. Defendant knew that Plaintiffs and Class members conferred a benefit on them and accepted or retained that benefit. Defendant profited from maintaining Plaintiffs' employment information and used Plaintiffs' and Class member's Private Information for business purposes.

168. Defendant failed to secure Plaintiffs and Class members' Private Information and, therefore, did not provide full compensation for the benefit the Plaintiffs and Class members' Private Information provided.

169. Defendant acquired the Private Information through inequitable means as it failed to disclose the inadequate security practices previously alleged.

170. If Plaintiffs and Class members knew that Defendant would not secure their Private Information using adequate security, Plaintiffs and Class members would not have agreed to release this information to Defendants.

171. Plaintiffs and Class members have no adequate remedy at law.

172. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class members conferred on them.

173. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class members, proceeds that they unjustly received from them.

**COUNT VI**
**Declaratory Relief**
**(On Behalf of Plaintiffs and the Nationwide Class)**

174. Plaintiffs' relegations and incorporates by reference all preceding allegations as if fully set forth herein.

183. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

184. An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiffs' and Class members' PII, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class members from future data breaches that compromise their Private Information. Plaintiffs and the Class remain at imminent risk that further compromises of their PII will occur in the future.

185. The Court should also issue prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect employees' PII.

186. Defendant still possesses the PII of Plaintiffs and the Class.

187. To Plaintiffs' knowledge, Defendant has made no changes to its data storage or security practices relating to the PII.

188. To Plaintiffs' knowledge, Defendant has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

189. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at Parker. The risk of another such breach is real, immediate, and substantial.

190. The hardship to Plaintiffs and Class members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs at Parker, Plaintiffs and Class members will likely continue to be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

191. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Parker, thus eliminating the additional injuries that would result to Plaintiffs and Class members, along with other employees whose PII would be further compromised.

192. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Defendant implement and maintain reasonable security measures, including but not limited to the following:

- engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on Parker's systems on a periodic basis, and ordering Parker to promptly correct any problems or issues detected by such third-party security auditors;
- engaging third-party security auditors and internal personnel to run automated security monitoring;
- auditing, testing, and training its security personnel regarding any new or modified procedures;
- purging, deleting, and destroying Private Information not necessary for its provisions of services in a reasonably secure manner;
- conducting regular database scans and security checks; and
- routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in favor of Plaintiffs and the Class and against Defendants, as follows:

A. For an Order certifying this action as a class action and appointing Plaintiffs and her counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and

Class members' Private Information, and from failing to issue prompt, complete and accurate disclosures to Plaintiffs and Class members;

C. For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to employee data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Data Breach;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained by Defendant as a result of its wrongful conduct;

E. Ordering Defendant to pay for no less than three (3) years of credit monitoring services for Plaintiffs and the Class;

F. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G. For an award of punitive damages, as allowable by law;

H. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

I. Pre- and post-judgment interest on any amounts awarded; and

J. Such other and further relief as this court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Date: October 15, 2024

Respectfully submitted,

*s/ Jason S. Rathod*
Jason S. Rathod

*jrathod@classlawdc.com*
Migliaccio & Rathod LLP
412 H Street NE
Washington, DC 20002
Tel: (202) 470-3520
Fax: (202) 800-2730